**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EDP:RMU
F. #2024R00447

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 12, 2026

By ECF

The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Catalina Corona
Criminal Docket No. 25-78 (NGG)

Dear Judge Garaufis:

The government respectfully submits this letter in anticipation of sentencing, scheduled for Thursday, October 15, at 11:00 a.m. The applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range is 78 to 97 months' imprisonment. On April 8, 2026, the defendant Catalina Corona pled guilty to wire fraud in connection with her role in an elder fraud scheme. As part of her agreement, the defendant stipulated that she would not advocate for a sentence below 24 months' imprisonment. See Court's Exhibit 1, ¶ 2. For the reasons set forth below and the reasons stated in the attached victim impact statements[1], the government respectfully requests that the Court sentence the defendant to a term of imprisonment within the Guidelines range. Such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing set forth at 18 U.S.C. § 3553(a). The government also requests that the Court delay entering an order of restitution[2] pending the government's provision, within 90 days, of detailed victim loss information.

---

[1] Given the sensitive nature of the victims' impact statements and the victims' privacy interests, the government has filed the letters under seal. Courts in this Circuit routinely seal documents that reveal the identities of victims entitled to restitution in criminal cases. See e.g., United States v. Doyle, No. 19-CR-2, 2019 WL 3772885, at *1 (W.D.N.Y. Aug. 9, 2019) (sealing government's restitution statement); United States v. Moore, Nos. 09-CR-881-1, 12-CV-1600, 2015 WL 3457242, at *6 (S.D.N.Y. May 29, 2015) (noting that schedule of victims providing the names and addresses of defendant's victims were filed under seal).

[2] The government anticipates that total restitution will be nearly $10,000,000.

## I. Procedural Background

On February 19, 2025, the defendant was charged by Complaint with wire fraud and was released on a $700,000 bond secured by her family home. See ECF No. 1, ECF No. 10, Affidavit for Judgement by Confession. On March 3, 2025, a grand jury in the Eastern District of New York returned a seven-count indictment (the "Indictment") charging the defendant with elder fraud-related crimes. Specifically, Corona was charged with five counts of wire fraud (Counts One through Five), one count of bank fraud (Count Six), and one count of aggravated identity theft (Count Seven). On April 8, 2026, pursuant to a plea agreement, the defendant pleaded guilty to Count One of the Indictment.

## II. Factual Background

The facts of this case are set forth in detail in the Presentence Investigation Report ("PSR"), dated September 9, 2026. PSR, ¶¶ 6-18. Corona's offense conduct is summarized below.

From approximately the early 2000s through 2022, Corona was employed as a secretary and personal assistant by Victim-1 (DOB 9/7/1924) and his firm Community Associations Institute ("CAI"). After Victim-1 passed away in May 2022, Corona worked as a personal assistant for Victim-1's wife, Victim-2 (DOB 8/21/1953) (collectively, the "Victims"). PSR ¶¶ 9, 12.

Between approximately 2017 and April 2024, the defendant engaged in a fraudulent scheme to defraud both elderly Victims of nearly $10,000,000, by: (1) forging their signatures on checks made out to "cash," which Corona would then deposit into her personal accounts; and (2) transferring funds directly from the Victims' accounts to the defendant's own personal bank accounts. Id. at ¶ 10. Corona had access to the Victims' social security numbers, their checkbooks, credit card numbers, bank account numbers, and all passwords to the Victims' financial accounts. Id. at ¶ 11.

Victim-1's health began to deteriorate in approximately 2021. PSR ¶ 16. Victim-2 told law enforcement that if the defendant had put a check in front of Victim-1 to sign during this time, he would have signed it without question. Id. After Victim-1's death, Corona's responsibilities as a personal assistant to Victim-2 included paying bills, booking travel arrangements, filing, and keeping lists up to date. Id. ¶ 12. One of the defendant's tasks included making out checks for Victim-2's review and signature. Id. These checks would be signed by Victim-2, and checks would be maintained in two separate black checkbooks: one belonging to Victim-2, and the other in the care of the defendant. Id. This meant that Victim-2's checkbook had different sets of check numbers than the one in the defendant's care. Id. Notably, Corona did not have signing authority for any of the Victims' accounts. Id. at ¶ 11. As part of the investigation into Corona's fraud, the Federal Bureau of Investigation ("FBI") identified several instances of the defendant misrepresenting herself as Victim-2 to Bank-1 by providing Victim-2's name and her social security number. Id. at ¶ 12.

Specifically, law enforcement uncovered that on April 3, 2024, the defendant attempted to deposit a check from Victim-2's checkbook made out to "cash" into her personal account. Id. ¶ 13. The defendant had called Bank-1 in response to fraud alerts she had received

related to a deposited check made out to "cash" and signed by Victim-2. The defendant introduced herself to the representative as Catalina Corona, confirmed her phone number, and provided the last four digits of her social security number. The check in question was numbered 2207, dated March 26, 2024, and made out to "cash" for $1500.00. See check below.




During the call, the defendant had stated originally that she had written the check, but the check was payable from someone else. PSR ¶ 13. The defendant then denied writing the check out to herself, despite the admission earlier on the call. Id. The representative further noted that the defendant's Bank-1 account listed the same phone number as the phone number listed for Victim-2's Bank-1 account. Id. The defendant explained that Victim-2 was her employer and that Victim-2's home number was listed on both accounts because she is always at Victim-2's residence and uses Victim-2's home phone number on her account. Id. However, based on her background check, law enforcement discovered that the defendant's own cell phone number was listed as the primary contact number on both her account and Victim-2's account. Id.

Later that same day, Victim-2 received a phone call from Bank-1 to verify the validity of a check numbered 2207 made out to "cash". PSR ¶ 14. Victim-2 represented that she asked the Bank-1 representative to provide her with the details of the check in question. Id. The check did not match up with the copies of checks in Victim-2's possession. Id. Victim-2 informed the representative that she had not written the check and it should not be accepted. Id. Victim-2 then placed the representative on hold and called the defendant. Id. Victim-2 informed agents that while she was on the phone with the defendant, Victim-2 asked if the defendant had any knowledge of the fraudulent check. Id. The defendant then said that she would talk to Bank-1 to straighten out the issue, and that it was possible she had made a mistake. Id. Victim-2 fired the defendant immediately thereafter.

Based on law enforcement's subsequent investigation, law enforcement discovered that the defendant had stolen nearly $10,000,000 from the Victims. See generally PSR ¶ 15. Specifically, the defendant stole approximately $675,000 in funds from the Victims' Bank-1 checking accounts and deposited the funds into her personal Bank-1 account, and another approximately $53,000 into the defendant's other Bank-1 account. Id. A total of nearly $2,000,000 in funds was stolen from the Victims' Bank-1 checking account to pay the defendant's Citi Bank Credit Cards. Id. An additional approximately $2,500,000 in funds were stolen to pay the defendant's JP Morgan Credit Cards. Id. Another approximately $510,000 in funds was stolen from the Victims' Bank-1 checking account to pay the defendant's Barclays Credit Cards. Id.

The Victims' Bank-1 checking account statements show several transactions where funds were deposited from the account directly to one of accounts. Id. For example, the December 7, 2020 bank statement and December 6, 2021 bank statement from the Victims' Bank-1 checking account reveal various transactions where funds from the Victims' account were used to pay the defendants' Citi Bank Credit Cards.

| | | |
|---|---|---|
| 12/7 | Citi Card Online Payment 201204 430292435227659 Catalina Corona | 1,196.98 |
| 12/7 | Citi Card Online Payment 201206 430293742838988 Catalina Corona | 2,000.00 |

| | | |
|---|---|---|
| 12/6 | Citi Card Online Payment 211205 420607260176094 Catalina Corona | 2,565.12 |
| 12/6 | Citi Card Online Payment 211205 430607982059150 Catalina Corona | 2,600.72 |

In addition to stealing money from the Victims' Bank-1 checking account, the defendant stole money from the Victims' Bank-1 brokerage account. See generally PSR ¶ 15. The defendant stole approximately $100,000 in funds from the Victims' Bank-1 brokerage account, which were deposited into the defendant's Bank-1 account. Id. A total of nearly $800,000 in funds were stolen from the Victims' Bank-1 brokerage account to pay the defendant's Citi Credit Cards. Id. Additionally, nearly $619,000 in funds were stolen from the Victims' Bank-1 brokerage account to pay the defendant's JP Morgan Credit Cards. Id. The defendant also stole nearly $2,110,000 in funds to pay her Barclays Credit Cards. Id. There were also checks made out to "cash" which totaled approximately $70,000 – all of which were cashed from accounts maintained by the defendant. Id.

As part of this investigation, the FBI was able to trace how Corona used some of the stolen funds. See generally PSR ¶ 15. By reviewing the defendant's financial statements, agents discovered that the defendant used approximately $1,117,000 of stolen funds to purchase merchandise at Louis Vuitton, approximately $125,500 to purchase merchandise from Cartier, nearly $300,000 in stolen funds to purchase merchandise at Gucci, and approximately $305,000 in stolen funds to purchase merchandise from Apple. Id. See below for photos of the items purchased with the stolen funds.

**Cartier:**

| | | | | | |
|---|---|---|---|---|---|
| 8/7/2020 | 9000442250 | Wedding band, pink gold, diamond | Article #: CRB4050859<br>Serial #: GKW559 | 3865.06 |  |
| 12/19/2020 | 3.0374E+14 | Love necklace, yellow gold, diamond | Reference: CRB7058400<br>Individual #: KYP108 | 8437.81 |  |
| 12/26/2020 | 3.0374E+14 | Love necklace, white gold, diamond | Reference: CRB7058000<br>Individual #: FHG968 | 9036.63 |  |

**Louis Vuitton:**

| | | | | |
|---|---|---|---|---|
| 9/7/2022 | KEEP.25 BA.M.CHESS | M20872 | 2400 |  |
| 9/17/2022 | MAIDA HOBO M.EMP.TOUR. | M45523 | 3,400 |  |
| 10/10/2022 | WALLET TRUNK G.D.GLIT.SIL | M20329 | 10,000 | ? |

**Gucci:**







III. <u>The Guidelines Calculation</u>

Probation calculates the defendant's adjusted Guidelines offense level as 28 (PSR ¶¶ 23-28), and her criminal history category as I (PSR ¶ 35), leading to a Guidelines range of incarceration of 78 to 97 months (PSR ¶ 77):

| | |
|---|---|
| Base Offense Level (§§ 2B1.1(a) (1)) | 7 |
| Plus: Loss More than $9.5 Million (§ 2B1.1(b)(1)(K)) | +20 |
| Plus: Vulnerable Victims (§ 3A1.1(b)(1)) | +2 |
| Plus: Abuse of Position of Trust (§ 3B1.3) | +2 |
| Minus: Acceptance of Responsibility (§ 3E1.1(a), (b)) | -3 |
| Total Adjusted Offense Level: | <u>28</u> |

IV. <u>Consideration of Section 3553(a) Factors</u>

For the reasons set forth below, the government respectfully submits that a sentence of 78-97 months' imprisonment is appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). The government has been able to trace nearly $10,000,000 that the defendant defrauded from her elderly employers. The government and Victim-2 have deduced, based on the defendant's financial profile documented in the PSR, that Victim-2 will not get this money back. The government estimates that the Victim is owed nearly $10,000,000 in restitution. Here, the extremely serious nature of the offense, the need for deterrence, the need to promote respect for

the law and to provide just punishment, especially given the fact that Victim-2 will not be made whole, warrants a sentence of no more than 97 months' imprisonment.

A. Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, the Supreme Court clarified the proper procedure and order of consideration for sentencing courts as follows: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

B. A Sentence within the Guidelines Range is Appropriate

1. The Nature and Circumstances of the Offense

Here, as described above, the offense is particularly serious: Corona victimized her elderly employers defrauding them of nearly $10,000,000 to enrich herself through depositing money directly from the Victims' accounts to her own accounts, and purchasing over 200 high-end luxury items. The defendant had full control over the Victims' accounts and, as such, transferred money directly from the Victims' accounts to her own personal accounts. The defendant additionally had full access to Victim-2's checks and used her access to forge checks with Victim-2's signature to then deposit into her own accounts.

Notably, the defendant engaged in deceitful tactics beyond forging the Victims' names on checks made out to "cash." Other than the April 2024 call where the defendant admitted to writing a check out to cash under Victim-2's name, there are other calls where the defendant impersonated Victim-2 and/or confirmed payments or deposits into her accounts from funds received from the Victims' accounts. The following consists of three other calls with Bank-1 where the defendant defrauded Bank-1 by impersonating Victim-2.

- July 22, 2019: Wells Fargo Bank calls asking for Victim-2 and the defendant answers the

phone as Victim-2. The defendant provides Victim-2's social security number and confirms information about a wire transfer.

- November 27, 2020: The defendant calls Bank-1 to ask for an increase in the amount allowed to be withdrawn from the ATM at one time. Interestingly, on November 24, 2020, the defendant had cashed a check to "cash" signed by Victim-1 for $5,000.


[redacted]
1276
1-1288/260 9029
11/24/2020 Date
Pay to the Order of Cash $5,000.00
Five Thousand and no/100 Dollars
Wells Fargo Bank, N.A.
New York
wellsfargo.com
For
⑆026012881⑆ 2391069750⑈ 01276

- September 12, 2023: The defendant calls Bank-1 in response to alerts regarding verification requests, and to check on the status of her order for new checks. The defendant represents herself as Victim-2.

Additionally, the defendant concealed the whereabouts of the high-end luxury items purchased with the stolen funds by renting out two different storage spaces. Law enforcement obtained search warrants for the defendant's residence and the two storage units. Law enforcement estimated that there were over 300 luxury items in these units.

Further, defense counsel argues that "Ms. Corona's criminal behavior was an aberration." See Defense Sentencing Memorandum at 19-20. That argument, however, has far more potency when the defendant stands convicted of conduct committed in a moment of desperation, or when the defendant is convicted of an act that can be seen as a true aberration from an otherwise lawful and decent life. That argument doesn't quite fit, however, when the conduct in question spanned approximately eight years and required hundreds of discrete acts of fraud. Moreover, the defendant did not stop her conduct until after she was caught by Victim-2 and Bank-1.

It's worth highlighting the steps the defendant took on a regular basis to commit this fraud through cashing forged checks. The defendant would write a check from Victim-2's checkbook and would forge Victim-2's signature whenever she needed an influx of cash in her account. After writing the check and forging the signature, the defendant would mobile deposit these checks by taking photos of the check and uploading the photos directly on her Bank-1 online account. The defendant made sure to change the phone number on Victim-2's profile so that should any question of fraud arise, the defendant would be the person called by a Bank-1 representative. This process, the forgeries, the addition of Victim-2's Bank-1 account to Corona's

personal account, and the change of Victim-2's phone number on Victim-2's Bank-1 account went on month after month, and continued for years. The fraud here was routinized. Again, there is aberration and there is this, its complete and polar opposite.

Another factor in demonstrating the seriousness of the fraud warranting a significant sentence is the type of fraud this was: elder fraud. Unlike accounting fraud, the defendant's fraud was very personal and targeted vulnerable members of the community: the elderly. Financial fraud against elderly Americans is a crime that is all too common in our society. See, e.g., Jennifer Bisram, Increasing elder fraud a "huge concern," FBI and NYC officials say, CBS News, March 2, 2026, https://www.wsj.com/articles/elder-fraud-on-the-rise-11551309306. The defendant used her position as the Victims' employee to deceive the Victims and make millions of dollars. Elder fraud often deprives victims of important things that victims had worked hard and planned for all their lives. These include: a comfortable retirement; the security of not having to worry that much about finances as a senior; and the ability to spend time with, and provide meaningful support for, family members. Moreover, while the financial losses are staggering, they are by no means the only harm. A common reaction is humiliation and anxiety. Victims blame themselves for being "stupid" to fall for the scheme. These effects can linger for years.

The defendant argues that neither Victim noticed that the stolen funds were missing from their accounts, and, for this reason, the Court should not consider the loss enhancement as an important factor at sentencing. See Defense Sentencing Memorandum at 23-24. But this is exactly the reason why Corona chose to defraud these particular Victims. She knew that there was a probability that the stolen funds would go unnoticed given the Victims' wealth, and knew that the Victims had complete trust in Corona. Further, affluence is not a basis for leniency under § 3553(a). See United States v. Watson, No. 23-CR-82(EK), 2024 WL 3471303 (E.D.N.Y. July 19, 2024)); United States v. Cabot, 755 F. App'x 75 (2d Cir. 2018) (a defendant cannot escape a vulnerability-based variance by labeling victims "accredited" or "sophisticated" investors). Moreover, Victim-2 and her sons document the "emotional betrayal" they faced following the uncovering of the fraud. Victim-2 and her sons make clear that Corona had become akin to a family member and that they trusted her wholeheartedly. The family has faced emotional harm, shock, and embarrassment to the family's reputation.

The fact that the defendant did not break windows or doors to take the Victims' assets from them, that she didn't point firearms at the Victims to get them to hand over their assets, and did not threaten the Victims with bodily harm in no way diminishes the seriousness of this offense. Indeed, the use of technology, guile, deceitful tactics and other subtle means to achieve her criminal goals makes the defendant particularly devious and a dangerous actor.

2. The History and Characteristics of the Defendant

The defendant contends that she should receive a downward variance based on her "childhood that inflicted deep and lasting psychological wounds." See Defense Sentencing Memorandum at 15. While the defendant's upbringing and exposure to abuse at such a young age is unfortunate, the mere existence of some diagnosable mental disorder does not alone establish a cognitive impairment warranting a departure. See United States v. Withers, 100 F.3d 1142, 1147-48 (4th Cir. 1996) (finding that defendant, despite depression, was fully capable of following

complex set of instructions to transport heroin successfully into United States); United States v. Edwards, 98 F.3d 1364, 1367 (D.C. Cir. 1996) (holding that psychological or behavioral disorder cannot constitute reduced mental capacity absent "accompanying inability to reason"); United States v. Goossens, 84 F.3d 697, 701 (4th Cir. 1996) (finding that defendant, despite anxiety disorder, had "above average intellectual capacity," "high level of mental functioning," held "responsible position," and did not show he was "unable to process information or to reason"); United States v. Cantu, 12 F.3d 1506, 1512 (9th Cir. 1993) ("reduced mental capacity" connotes impairment of intellect, "failure to be able . . . to grasp ordinary concepts," and "impair[ment] [of] the formation of reasoned judgments"); United States v. Frazier, 979 F.2d 1227, 1229-30 (7th Cir. 1992) (holding that district court erred in granting departure where, despite "dysthymic disorder," defendant had normal ability to think rationally and respond coherently); United States v. Johnson, 979 F.2d 396, 400-01 (6th Cir. 1992) (district court abused discretion in granting a downward departure where there was no indication that defendant's "severe adjustment disorder" affected his ability to reason or to process information, defendant had displayed considerable "mental agility" in personal and professional affairs, and defendant's behavior was "easily explained by greed").

The defendant must establish a causal link between the mental impairment and the offense conduct. See, e.g., United States v. Johnson, 49 F.3d 766, 768 (D.C. Cir. 1995) (defendant's Post Traumatic Stress Disorder did not contribute to drug offense). Here, the defendant has not established that Dr. Drob's diagnosis of a major depressive disorder led her to commit the offense conduct. Dr. Drob may be correct that the defendant suffers from early trauma, emotional neglect, abuse, and difficulties in attachment, but his analysis does not sufficiently link those difficulties to the long-standing, purposeful, and knowing course of criminal conduct. Corona's acknowledgment of her wrongdoing at her plea hearing demonstrates that she knew what she was doing was wrong. This was not a crime of impulse or delusion. It was the product of a defendant defrauding two elderly victims for nearly eight years, taking advantage of their vulnerability and trust in their employee.

3. Affording Deterrence and Protecting the Public

The Court's sentence should also further the aims of general and specific deterrence. U.S.S.G. § 3553(a)(2)(B), (C).

There is a greater need for general deterrence for sophisticated fraud schemes like this that are difficult to detect and prosecute. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005) (internal quotation marks omitted); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our

findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.”).

Here, in light of the defendant’s choice to deceive her elderly employers and to leverage her facility with online banking, and the Victims’ inability to manage their online accounts, there is a strong and self-evident need for specific deterrence.

V. Conclusion

For all the reasons articulated above, the government respectfully requests that the Court sentence defendant Catalina Corona to a term of incarceration of 78-97 months’ imprisonment.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Rebecca M. Urquiola
Assistant U.S. Attorney
(718) 254-7000

Attachments & Enclosure

c.c.: Clerk of Court (by ECF)
Zachary Margulis-Ohnuma, Esq. (Attorney for Defendant) (by ECF)